VICTOR SHERMAN (SBN: 38483)
LAW OFFICES OF VICTOR SHERMAN
A Professional Law Corporation
2115 Main Street
Santa Monica, California 90405

Office:      (310) 399-3259
Facsimile:   (310) 392-9029
E-Mail:      Ssvictor@aol.com

Attorney for Defendant
JOSE BAUTISTA GARCIA

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.: CR 13-0451-GW |
| Plaintiff, | DEFENDANT JOSE GARCIA'S SENTENCING MEMORANDUM |
| v. | |
| JOSE BAUTISTA GARCIA, aka JOE GARCIA, et al., | |
| Defendants. | DATE: January 28, 2016<br>TIME: 8:00 a.m.<br>COURT: Hon. George H. Wu |

Defendant Jose Garcia submits his Sentencing Memorandum and Response to Presentence Report and Recommendation.

Dated: January 14, 2016                    Respectfully submitted,

                                By:    /s/ Victor Sherman
                                       VICTOR SHERMAN
                                       Attorney for Defendant
                                       JOE GARCIA

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

MEMORANDUM OF POINTS AND AUTHORITIES - Overview . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.    Offense and Loss Amount . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      B.    Background and History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      C.    Sentencing Disparity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      D.    Family Circumstances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      E.    Sentencing Recommendation . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

CONCLUSION .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## **TABLE OF AUTHORITIES**

**Page**

U.S.C. §§ 371, 1344 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

U.S.S.G. § 1B1.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

U.S.S.G. § 2B1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

18 U.S.C. § 371 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

# MEMORANDUM OF POINTS AND AUTHORITIES

## Overview

Jose Garcia has pleaded guilty to conspiracy to commit bank fraud. 18 U.S.C. §§ 371, 1344. The charges arise out of the housing meltdown and subprime mortgage collapse that occurred in 2007 and 2008. During the housing boom, Mr. Garcia was a licensed real estate agent and broker, employing at various times sixty to seventy-five agents at Century 21 Premier Realty in Oxnard. He also co-owned Century 21 Premier Hills and Estates in Camarillo with Raul Rocha. In addition, with his wife Lucy Garcia, Mr. Garcia co-owned Jolu Mortgage Brokerage Co., which did business as New Concepts Home Loans and New Concepts Escrow. During the relevant time period, Mr. and Mrs. Garcia split duties: Mr. Garcia ran the real estate business and Mrs. Garcia, who was a licensed real estate agent, ran the loan and escrow business. The two businesses were located in separate buildings: Century 21 Premier Realty was located at 1950 N. C Street in Oxnard, and Jolu was located at 221 West Gonzales Road.

In an effort to increase his business, Mr. Garcia ran training classes and hired 17 individuals to seek buyers and sellers. These classes were based on the methodology of Mike Ferry, a coach for real estate agents. Claiming to have a multi-million dollar company with tens of thousands of clients, Mr. Ferry provided his clients with sales scripts for going door-to-door to solicit business. Agents pay $1,000 per month for his coaching.

With this as inspiration, Mr. Garcia implemented these practices in the hope of generating new business. Unfortunately, some of this business ultimately involved buyers who purchased homes that they could not afford. In some cases, these buyers obtained loans through fraudulent representations regarding their income and assets, while in other instances, "straw buyers" were used. Mr. Garcia had little direct involvement with these buyers, but also exercised insufficient control over his employees.

This situation was exacerbated during the time period of the indictment by the ubiquity of Stated Income/Stated Asset loans. In order to qualify for this loan, a borrower merely had to state his or her income and assets on the standard Uniform Residential Loan Application ("Form 1003"). He or she did not have to provide proof of income or assets, and the loan broker who put together the loan application was under no obligation to ask for such proof. Instead, the loan broker packaged the loan (compiling the 1003, credit report, the Purchase and Sales Agreement, legal disclosure forms, and the appraisal), and submitted it to the bank's underwriters. During the time period at issue in the indictment, one common condition was a tax letter prepared by a registered tax preparer or a Certified Public Accountant ("tax letter" or "CPA letter"). Some of the loans that were made through Jolu included falsified tax letters.

As became clear after the housing market collapsed, many banks were unconcerned about borrowers' qualifications, including their ability to make payments on their mortgages, because the banks were not planning to continue holding the loan; instead they sold them to investment banks that packaged hundreds of loans together into securities and sold them to investors (as so-called "mortgage-backed securities"). As home prices rose during the housing boom, the banks created stated loans because the number of people who had income sufficient to meet the requirements of conventional loans and government-backed Federal Housing Administration loans bottomed out. Banks wanted to lend more money and continue to profit. So, according to the banks' own policies and guidelines for stated income loans, loan brokers were under no obligation to confirm an applicant's income.

## Argument

A.  *Offense and Loss Amount*

As is not disputed, Jose Garcia owned and was the licensed broker for the businesses at issue in this case. In his plea agreement, Mr. Garcia agreed to a loss

of over $1 million and to having held a leadership role because he is aware that he is ultimately responsible for the misfeasances in the way that his businesses were conducted. He also takes responsibility for developing a sales strategy that turned out to generate many unqualified borrowers as a result of sending salespeople door-to-door. PSR ¶¶ 32-33.

Nonetheless, as the allegations show, the conduct at issue was carried out almost entirely by alleged coconspirators. In most instances, Mr. Garcia became involved after the fact when problems had already arisen. Thus, he spoke with R.C. about a fraudulent tax letter that R.C. had written at the request of someone else and offered some fruitless questions about how R.C. might be able to explain himself. PSR ¶¶ 47-49.

Likewise, in the case of the property on Corte Regalo, the broker was R.R., who set up the loan with a straw buyer for R.R.'s employee, L.C. Mr. Garcia disputes the allegation in paragraph 57 of the PSR that he was the broker. The $825,000 loan was handled by First Magnus Mortgage, PSR ¶ 58, a company in which Mr. Garcia has no interest or involvement. Again, Mr. Garcia's only conduct was after the fact when L.C. could not make his mortgage payment. Mr. Garcia and two other individuals, including R.R., loaned money to L.C. on two occasions, one year apart.

Although Mr. Garcia admits that he was involved in obtaining a quitclaim from A.A. for the property on Fuchsia, PSR ¶¶ 71-72, he explains that he felt compelled to do so since his mortgage company had prepared the loan and would have to assume the mortgage if there was a default in the first three months. On the other hand, Mr. Garcia denies the allegation in paragraph 67 of the PSR that R.R. was acting under his direction. R.R. was also a broker and worked independently of Mr. Garcia. In fact, R.R. was the designated broker for the Camarillo office and was responsible for running its day-to-day operations, while Mr. Garcia's office in Oxnard served as the back office, making sure the real estate

closings emanating out of Camarillo were documented properly, agents were paid commissions, and sufficient office support was available.  R.R. typically referred his real estate clients to his sister at Mortech Financial for assistance with their mortgage loans.

    Simultaneously with the Fuchsia loan, A.A. purchased another home on Dunbar Street.  It is alleged that coconspirators prepared the false loan application and verification of rent.  A coconspirator also solicited the false tax letter that was used for both the Fuchsia and Dunbar loans.  The only mention of Mr. Garcia with respect to this transaction is the allegation that L.H. prepared tax letters for Mr. Garcia and his wife and also was the accountant who prepared the tax letter for A.A.  PSR ¶¶ 77-78.  While it may be that L.H. prepared tax letters for individuals at Jolu and that, by extension, L.H. can be said to have prepared letters for Mr. Garcia since he owned Jolu along with his wife, Mr. Garcia denies ever having been involved with the lending side of his business and specifically denies having ever solicited a tax letter from L.H.[1]

    Despite limited involvement, Mr. Garcia takes responsibility because of his role within his companies and his responsibility for supervising employees and maintaining ethics within his workforce.  Under the guidelines that existed at the time of the plea agreement, Mr. Garcia admitted that he was responsible for over $1 million in losses, even though he was was not personally involved in initiating any of the loans.  For instance, as to the property on Cedar Street, Platinum mortgage did the loan and Mr. Garcia was not the broker for said company. As another example, Mr. Garcia had no role in selling or obtaining a loan for the property on West Birch Street.  Bot of these properties were part of the computation in determining the loss in excess of $1 million.

---

[1] It is Mr. Garcia's recollection that, in one of her interviews, L.H. also denied having ever prepared a tax letter at Mr. Garcia's request.

U.S.S.G. § 1B1.3(a)(1)(B) was recently amended (Nov. 1, 2015) to provide that, in the case of jointly undertaken criminal activity, relevant conduct only applies to acts and omissions of others that were –

    (i) within the scope of the jointly undertaken criminal activity,

    (ii) in furtherance of that criminal activity, and

    (iii) reasonably foreseeable in connection with that criminal activity.

The new guideline no longer refers to *"all* acts and omissions" that were reasonably foreseeable and now makes clear that "[a]cts of others that were not within the scope of the defendant's agreement, even if those acts were known or reasonably foreseeable to the defendant, are not relevant conduct under subsection (a)(1)(B)." U.S.S.G. § 1B1.3 cmt. (n.3(B)). In this case, defendant's involvement was not direct in many of the transactions that make up this case. On those occasions when he did become aware of offense conduct, he tried to ameliorate the problem, such as by passively suggesting ideas to R.C. regarding a phony tax letter (Cedar Street), helping a defaulting borrower make payments (Corte Regalo) and obtaining a quit claim to a home that was in default (Fuchsia).

When the conduct of others does not meet each of the criteria under subsection (a)(1)(B), the conduct is not relevant conduct. At a minimum, the defendant should not be held responsible for the property on West Birch Street, which results in 14-level increase for a loss over $1 million, rather than a 16-level increase, because the loss would be under $1.5 million. Furthermore, defendant is entitled to the benefit of the amended guidelines and believes that his limited role places his conduct outside the scope of the revised relevant conduct guideline.

**B.**    *Background and History*

As the presentence report relates, Mr. Garcia had a difficult childhood. He was born and lived in Mexico until he was nine years old and moved with his mother and siblings to East Los Angeles. He states that he found himself in a new culture with very little to connect him to his new home. Although his father,

Antonio, became more involved in his life, he was in and out of the home and was abusive when he was around. Mr. Garcia's mother, Elva, found work in a factory, and Mr. Garcia wound up under the supervision of uncles whom he found to be strict and unpleasant.

Over time, the family moved to Fontana and then to Ventura County. At age 14, Mr. Garcia ran away from home, and by age 15, he dropped out of school and became an emancipated minor. He remained close to his mother and siblings, but wanted little to do with the rest of his family, including his father who died of a heart attack at age 60. Mr. Garcia was only 17 when he moved out of his family's home and married his first wife, Alba Rodriguez. The couple had three children, Jose Jr., Elba and Marissa, before they divorced in 1987 after four years of marriage. He paid child support and maintained a close relationship with his children who are now adults.

In 1990, when he was 24, Mr. Garcia became a licensed real estate agent. Previously, he had worked as a butcher and forklift operator. In 1992, he married his current wife, Lucy, née Munoz, Garcia. With Lucy, Mr. Garcia had two more children, Matthew, age 18, and Joshua, age 16. Joshua is developmentally disabled after having suffered swelling in his brain when he was a year old. Joshua, who has the cognitive abilities of a 10-year-old cannot care for himself and has seizures. He is closely monitored medically, needs constant adult supervision and has private insurance to cover his care.

Around 1998, defendant became a licensed broker and formed Premier Realty, which he owns and operates. He and his wife, Lucy, also ran a Jolu, a lending company, which did business as New Concepts Home Loans and New Concepts Escrow. Along with another broker, Raul Rocha (R.R.), Mr. Garcia also owned Century 21 Premier Hills and Estates in Camarillo. As a broker, R.R. operated independently of Mr. Garcia, including originating the sale of the property on Fuchsia Street.

C.     *Sentencing Disparity*

It is acknowledged that Mr. Garcia had a supervisory role in the minor Ventura County real estate empire that is at issue in this case. He also combined lax oversight with the kind of marketing that brought about the troubled loans and losses in this case. This did not happen in a vacuum, however. As is now well known, lenders were engaged in an even more reckless policy that offered teaser rates and made it possible for individuals to qualify for loans that they could never afford. The salespeople that Mr. Garcia energized to find and close sales were all too willing to exploit the banks' willingness to lend to almost anyone.[2]

As for Mr. Garcia, it is hard to see his hand in the charged transactions. The same is not true of other defendants. Jose Murguia was involved in at least three fraudulent loans or loan applications and obtained at least 17 fraudulent tax letters, mostly from L.H. whom he regularly paid. Murgia was sentenced to *six months.*

Similarly, Sesilia Garcia submitted at least four fraudulent loan applications and paid at least $900 for fraudulent tax letters. Garcia was sentenced to *five months.* Meanwhile, Lili Ayala Hernandez ("Ayala") was sentenced to *six months* based upon a plea agreement that held her responsible for a single property that incurred a $300,000 loss. The original indictment, however, recites that Ayala prepared at least two fraudulent loans, obtained at least three fraudulent tax letters, and paid at least $600 for the tax letters she obtained. Likewise, Cesar Azamar, was paid at least $1300 for false tax letters, at least two of which were used in fraudulent loan applications, and, along with defendant Ayala, also submitted a fraudulent loan application for $438,000. Azamar received a sentence of *seven months.*

The stand-outs among Mr. Garcia's codefendants are Greg Quinn and

---

[2] Unlike other defendants, Mr. Garcia pleaded to a violation of 18 U.S.C. § 371, which has a five-year statutory maximum. The Court should take this into consideration when determining sentencing disparity.

7.

1  Lidubina Perez, both of whom have prior convictions and guideline offense levels
2  of 20.  Having been sentenced to 16 months in prison for another fraud, Quinn
3  came to his sentencing in this case after having admitted to at least three
4  fraudulent loans (Fir Avenue, Via Calderon and Barton Avenue), all of which
5  were foreclosed upon and resulted in losses.  Although the loss for Via Calderon is
6  not reported, the losses from Fir and Barton totaled $744,437.  In arguing that
7  Quinn should receive a guideline sentence of 37 months, the government claimed
8  that the "three deals that formed the factual basis for defendant's guilty plea were
9  a perfect microcosm of the greater conspiratorial offense conduct."  Quinn
10 received a sentence of *14 months.*

11         Ms. Perez also has a prior state conviction for perjury related to a loan
12 transaction.  She was sentenced to six months in that case.  Although Ms. Perez is
13 accused of having completed at five fraudulent loans for a total of almost $1.2
14 million with restitution of $735,750, both the government and probation officer
15 recommended a sentence of 14 months, most likely because Ms. Perex, like Mr.
16 Garcia, has a disabled son.  When Ms. Perez asked the Court to sentence her to a
17 one-month period of incarceration plus 11 months of home detention, the
18 government responded that "she solely operated the conspirators' Bakersfield
19 office; she submitted multiple fraudulent loan applications; she did not provide the
20 extensive assistance offered by others; and, like co-defendant Greg Quinn (who
21 also received a 14-month sentence), she has a serious felony criminal history."
22 Ms. Perez was sentenced to *seven months*.

23         Mr. Garcia, on the other hand, took little role in soliciting buyers and did
24 not submit loan applications.  He also spent many hours with a Ventura County
25 District Attorney's Investigator discussing loans and purchases that went through
26 his companies.  About eight hours of these conversations were surreptitiously
27 recorded.  In addition to answering questions, Mr. Garcia attempted to cooperate
28 and voluntarily searched his office for files that the investigator requested.  Unlike

Quinn and Perez, he has a minimal criminal history and a criminal history score of zero.

Accordingly, no defendant without a criminal history has been sentenced to more than *seven months* and no defendant who has previously been convicted of fraud in connection with the lending industry has been sentenced to more than *14 months*. Many other accomplices have not been charged at all, including R.R., who was also a broker and had a hands-on role in transactions for which Mr. Garcia is being held accountable. While the probation officer believes that a sentence of 60 months, the statutory maximum, is appropriate, this would create substantial sentencing disparity, especially insofar as it confuses Mr. Garcia's role at the companies with his role in the offense conduct. As Mr. Garcia readily admits, he failed to properly supervise his employees and thus created an environment in which some people were able to commit frauds.

While it is tempting to characterize Mr. Garcia as being the kingpin in this operation, he was actually at a distance from most transactions and was not involved in the lending process. In fact, he is the low-hanging fruit in the context of this case. While he may have run his companies in such a way that it was all too easy for employees to commit fraud, there was a much broader and more pernicious factor in effect at the time of the offense. While it might have seemed like a fool's paradise, the lenders were crazy like a fox. With the stated income programs and extremely low starting rates, the banking industry created a culture that incubated fraud while they sold off their toxic loans to unwitting investors.

As participants in the misrepresentations, the banks were not deceived by applicants' stated incomes. In fact, this was the point to making loans without any real verification of a borrower's ability to pay. The banks would never confirm financial information or look at tax returns. They deliberately eschewed guidelines for vetting representations on loan applications and allowed loans to go through notwithstanding incongruities in loan documents. So long, as the applications

9.

looked a certain way, they would be approved.  Neither Mr. Garcia nor his employees formulated any the financial institutions' practices and policies, which were designed with intentional disregard of the solvency of borrowers and the extremely high risk of default. These were subprime loans offered to unqualified borrowers with little or no down payment at deceptively reduced initial interest rates.  Most of the bankers who devised the loans and repackaged them as securities were rewarded with huge profits, enormous bailouts and generous bonuses while most of the world suffered and the small-time players, like Mr. Garcia, became the targets for criminal charges.

### D.     *Family Circumstances*

Mr. Garcia's wife, Lucy, has suffered from physical ailments for many years.  She has been diagnosed with lupus and has undergone four spinal operations.  Her recovery has been slow, if not disappointing.  She is in pain and the condition appears to be worsening.  Her doctor now wants to perform two more surgeries, the first one on her cervical spine and, then, in the lumbar region.

Mr. Garcia, himself, also has significant physical issues in the form of mitral valve regurgitation.  He reports that this is hereditary and that his doctor wants to perform open heart surgery.  The issue was most likely exacerbated by Mr. Garcia's high blood pressure, which now appears to be controlled by medication.

By far, the most significant issues for both Mr. Garcia and his wife are the health and well-being of their youngest son, Joshua, who is developmentally disabled from a malformed brain and suffers from seizures.  Mr. Garcia reports that there is doctors recently discovered additional fluid and swelling in Joshua's brain.  An EEG that was performed on Jushua in November 2015 was abnormal in the frontal lobe.  His doctors want to perform more tests.  Because of Joshua's seizures and delayed development, he cannot care for himself needs constant adult supervision.

Although the probation officer suggests that defendant's wife, Lucy Garcia,

and other family members could care for Joshua during the period of the recommended 60-month sentence, Lucy is facing a potential sentence similar to her husband's, and the only other family member who lives in defendant's home is his son, Matthew Garcia, who is now attending college.

With significant medical issues of their own that require intervention, both Jose and Lucy are indispensable to Joshua's continuity of care. It is highly unlikely that anyone else in the family would be able to provide for Joshua's needs.

E.  **Sentencing Recommendation**

Defendant admitted to a loss exceeding $1 million. The only reason that a 16-level increase under the revised version of 2B1.1 has been recommended is because, among the properties identified in the properties identified in the overt acts listed in the information, is Birch Street, which caused a loss of $323,000. Inasmuch as Mr. Garcia had nothing to do with this sale or loan, the loss should not be counted against him. With a loss between $550,000 and $1.5 million, this increase in Mr. Garcia's offense level due to loss should be 14 levels. U.S.S.G. § 2B1.1(b)(1)(H). Accordingly, his total offense level should be 23.

As Mr. Garcia has noted, the sentences in this case (for those conspirators who were prosecuted) has ranged from six to 14 months. To avoid unwarranted sentencing disparity, Mr. Garcia's sentence should be in a similar range, especially because he has no criminal history points, unlike the two defendants who were sentenced to 14 months. Moreover, Mr. Garcia was cooperating with investigators long before he was charged in this case.

Finally, the most pressing issues for both Mr. Garcia and his wife are caring for Joshua and attending to their own medical needs. Although the couple was nominally in charge of the companies involved in the offense, their alleged coconspirators operated largely on their own and in response to a lending market that allowed almost anyone to qualify for a loan. Under these circumstances and,

in light of the other sentences in this case, Mr. Garcia believes that both he and his wife should be given substantially reduced sentences that are commensurate with the other sentences in this case.

Like Ms. Perez, the Garcias also have a disabled son. It they receive reduced sentences that include a home detention component and can be staggered, there will always be a parent present to care for Joshua. While Mr. Garcia does not want to minimize the gravity of the offense he admitted, he also wants to put his own conduct in perspective, both with respect to the lending industry in general and the independent activities of others. Although Mr. Garcia did promote a campaign to obtain real estate sales, he had nothing to do with the lending aspect of his business, which he clams not to understand. His lending staff was trained by underwriters and by wholesale loan representatives. Borrowers and their agents were instructed how to write up an application so that the loan would fund. It was thus the industry itself that encouraged the kind of conduct issue in this case.

Moreover, Mr. Garcia requests that the Court take account that he has already served approximately one month in jail since being charged and was subject to extreme conditions of home confinement for a year that only allowed him a few hours to attend church and attend to necessities. Since then he has been electronically monitored and must comply with a curfew. Apart from Mr. Garcia and his wife, the other defendants have not had equivalent restrictions placed on their liberty.

## **CONCLUSION**

Thus, based on Mr. Garcias actual involvement, the risk of sentencing disparity and his particular family circumstances, it is urged that the Court select a

//

//

//

12.

sentence in the range of the other defendants so that either Mr. Garcia or his wife can be at home to care for Joshua.

Dated: January 14, 2016                              Respectfully submitted,

                                    By:    /s/ Victor Sherman
                                           VICTOR SHERMAN
                                           Attorney for Defendant
                                           JOE GARCIA

13.