EILEEN M. DECKER
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
MARK AVEIS (SBN 107881)
Assistant United States Attorney
Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-4477
    Facsimile: (213) 894-6269
    E-mail:   mark.aveis@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 13-451-GW |
|---|---|
| Plaintiff, | GOVERNMENT'S POSITION REGARDING SENTENCING FACTORS AND RESPONSE TO PRESENTENCE REPORT FOR SENTENCING OF DEFENDANT JOSE GARCIA |
| v. | |
| JOSE GARCIA, | Date: January 28, 2016 |
| Defendant. | Time: 8:00 a.m. |

I.   SUMMARY

    The government concurs with the Probation Officer's

recommendation that defendant be sentenced as follows:

    -60 months imprisonment;

    -Pay restitution of $1,610,000, including that defendant be

    ordered to forthwith pay $120,000 toward restitution; and

    -Supervised Release of three years.

///

///

///

1

II.   <u>RESPONSE TO PRESENTENCE REPORT ("PSR")</u>

 A.   <u>Sentencing Guidelines</u>

 The government concurs with the PSR's Sentencing Guidelines calculations that yield a net offense level of 25 at Criminal History Category I, for a Guideline sentencing range of 57-63 months. Defendant's prison exposure must be capped at 60 months because the statutory maximum sentence for the offense is five years imprisonment.  18 U.S.C. § 371.

 Additionally, the parties stipulated that the base offense level should be seven.  However, the government agrees with the Probation Officer that the correct base offense level is six.  PSR, ¶¶ 88-90.

 Furthermore, the parties stipulated that, beyond those Guidelines specific offense characteristics or adjustments stated in the plea agreement, the parties would not seek further changes to the stipulated Guidelines.  However, as a legal matter, the government notes that defendant's solicitation of a tax preparer to concoct excuses to avoid law enforcement scrutiny was intended to obstruct justice.  PSR, ¶ 109.  There is no question that defendant controlled the conversation with the tax preparer and directed the tax preparer to provide false information to law enforcement.  The Court granted the government's motion in limine to introduce the recording of that conversation at trial because the Court found that the recording was relevant proof of defendant's intent and knowledge of the conspiracy. The government does not suggest that the recording be considered to support any Guideline changes to the plea agreement.  Instead, the recording is essential evidence that supports the 60-month sentence recommended by the Probation Officer.  The recording is essential

2

evidence to establish the serious nature and circumstances of the offense conduct.

B.   Factual Findings

The government concurs with the PSR's factual findings and with the facts described in the Probation Officer's Recommendation Letter.

There are several factual findings in the PSR to which defendant has objected.  They are notable because they contradict defendant's admissions and are not consistent with conspiracy law.

1.   Corte Regalo Property (PSR, ¶ 57)

Defendant objects and disputes that he was the broker for this transaction.  Defendant's Sentencing Memorandum, 3:14.  His objection should be overruled because it is immaterial and irrelevant.  The fraudulent loan for this property was brokered by the business that defendant admittedly owned.  See, e.g., Defendant's Memorandum, 6:23-25.  Thus, because defendant has admitted in connection with his guilty plea that the purpose of the conspiracy was for his brokerage to fraudulently originate loans, he is responsible for this failed deal and for all losses that resulted.

2.   Fuchsia Property (PSR, ¶ 67)

Defendant objects and disputes that the sales broker ("R.R.") for this transaction acted under this direction.  Defendant's Memorandum, 3:24.  Although defendant is wrong, it is unnecessary to resolve that dispute because the objection is immaterial and irrelevant.  Like the Corte Regalo transaction discussed above, as well as the more than 150 other fraudulent transactions brokered by defendant's loan brokerage, the loan application for this transaction was fraudulently originated by defendant's business and defendant is

3

responsible for it as another act in furtherance of the conspiracy.

3.  Bank Complicity

Defendant has repeated the old saw that was the subject of his failed opposition to the government's motions in limine to preclude evidence of bank negligence or complicity.  This Court granted those motions and pressed defendant's counsel to produce *any* evidence that banks had encouraged or participated in the offense conduct; none was produced.  Moreover, the Court noted that, even if that were the case, it would merely have made the banks *co-conspirators*.  Thus, any objections or argument that relate to this previously-overruled argument should again be overruled.

4.  West Birch St. Property (PSR, ¶ 50)

Defendant claims that he should not be held responsible for the loss sustained in connection with this transaction; he offers no evidence to support that claim.  Even if he had, it would be immaterial and irrelevant because, again, he does not dispute that this transaction was fraudulently brokered by his loan brokerage. Furthermore, even if the Court were to find, which it cannot, that this transaction was not in furtherance of the *admitted* conspiracy, it may only change the Guidelines loss calculations but does not change the final analysis that a 60-month sentence of imprisonment is a reasonable sentence.

5.  No Effect of Guideline Change in Definition of Relevant Conduct

Defendant has argued that the scope of relevant conduct under the Guidelines should limit his sentencing exposure not to "any" relevant conduct but to those transactions within the scope of the

4

conspiracy.  The government agrees.  Unfortunately for defendant, he has admitted that the scope of relevant conduct includes all loans fraudulently brokered by his own business.  He has thus defined that scope to include himself.  As the Probation Officer commented, there were over 150 bogus loans attributed to defendant's business, yielding loan fees *that defendant controlled and benefitted from* in the amount of more than eight million dollars ($8,000,000).  If nothing else, the evidence shows that the the government was overly generous in offering to allow defendant to plead guilty to a statute that capped defendant's prison exposure at less than half of what he could have faced if he were held fully responsible for his admitted offense conduct.

III.  <u>SENTENCING FACTORS</u>

A.   <u>Nature and Circumstances of Offense</u>

Despite defendant's effort to show bank complicity, it remains that defendant caused substantial losses not just to banks, but to the lives and creditworthiness of dozens of individuals who got credit they didn't deserve through the fraudulent efforts of defendant and his co-conspirators.  As defendant admitted, his offense conduct was not a "one-off," but rather continued over years and would likely have continued for years thereafter.  There can be no reasonable dispute that defendant's crime was serious.

B.   <u>History and Characteristics of Defendant</u>

There are several notable and negative facts relevant here.  In no particular order, defendant and his wife fled California to take-up residence in Costa Rica nearly immediately after federal agents searched defendant's loan and real estate offices in connection with

the investigation that later led to these charges.  Defendant bought real estate there, PSR, ¶ 168(d).  Defendant did not tell his own family members and made no arrangements to do so.  He made no arrangements to handle the occupancy of his home in California, obviously willing to sacrifice whatever equity he might conserve in exchange for avoiding extradition and prison.  Only after defendant perceived that no charges would be brought did he choose to return to California.  All of this was brought to Magistrate Judge Rosenberg's attention in connection with bail proceedings in which she affixed a substantial bail conditions and pledges of property.  Moreover, in the same proceedings, Judge Rosenberg found that defendant had not been candid with his finances and that questions remained about his assets.

Next, defendant to this day continues to brazenly lack any true contrition.  Thus, his history and characteristics are of an individual hard-wired to refuse the acceptance of responsibility.

Next, there is nothing out of the heartland regarding defendant's background that would permit any departure or consideration of leniency not already factored into the parties' negotiated disposition of a five-year statutory maximum sentence. Many, many defendants may have difficult childhoods or family situations, all cured by maturity or alternative caregivers.  In the latter regard, defendant failed to advise that he spent substantial time out of the home, leaving the care of his children to others; nothing is expected to change should he be imprisoned.  It is also interesting to note that, notwithstanding that he claimed that heart trouble runs in his family, he did not learn that he needed open

1   heart surgery until trial was to start in this case in April 2015.

2   PSR, ¶ 148(b).

3       Next, what *is* out of the heartland in comparison to the assets

4   of his fellow conspirators is defendant's financial statement.  As

5   shown at PSR 25-27, defendant has a substantial monthly income and

6   assets.  Apparently, he has compensated for earlier challenges in

7   life.

8       Next, defendant has shamelessly attempted to blame even his own

9   wife for the loan fraud, claiming that "they split duties: [he] ran

10  the real estate business and [defendant Lucy Garcia] . . . ran the

11  loan and escrow business [that processed the bogus loans]."

12  Defendant's Memorandum, 1:11-13.  This "characteristic" of defendant

13  must be factored into the sentencing equation as an aggravating

14  factor because, factually, defendant admitted that he conspired to

15  defraud lenders and, legally, defendant is responsible for all acts

16  of the conspiracy nonetheless.  A similar aggravating feature is that

17  defendant insists that "in most instances, [he] became involved after

18  the fact."  Defendant's Memorandum, 3:8.  There is no evidence that

19  defendant withdrew from the conspiracy.  Thus, this contention simply

20  shows that defendant, characteristically, is unremorseful.

21      Finally, there is insufficient evidence, if any evidence, that a

22  60-month sentence of imprisonment warrants any departure to permit

23  care giving.  The Ninth Circuit takes a dim view of a generalized

24  claim of a departure for extraordinary family circumstances absent

25  substantial evidence that defendant is the irreplaceable caregiver.

26  For example, in United States v. Leon, 341 F.3d 928 (9th Cir. 2003),

27  defendant pleaded guilty to preparing false income tax returns.  His

28

7

net offense level was 17; criminal history category was II.  His
Guideline range was 27-33 months.  Id., at 929.  The Ninth Circuit
affirmed the district court's downward departure of six levels, which
placed defendant in the highest Guideline level so as to permit a
"split" sentence between imprisonment and home detention, after
substantial litigation and two hearings regarding the defendant's
request for the downward departure.  Notably, the district court
reviewed and considered a psychologist's report that indicated that
defendant's wife, who was virtually home-bound and recovering from
renal cancer (that involved the removal of one kidney and a likely
grim prognosis as to the remaining kidney) "would be at risk of
suicide if she were to lose her husband due to death or
incarceration."  Id., at 931-932.  There were no alternate caregivers
available: one adult child had left home and had psychological
problems, and siblings were out of state.  Id., at 931.  The Ninth
Circuit was also careful to note that it "rel[ied] heavily on the
uncontested evidence in the record concerning [defendant's]
irreplaceable role as the sole person capable of providing support,
particularly emotional support, to his dependent wife who was
recovering from recent cancer related surgery, had a history of
preexisting depression, and was diagnosed as being a suicide risk if
her husband were to be incarcerated."  Id., at 933 (italics in
original).

Similarly, in United States v. Aguirre, 214 F.3d 1122 (9th Cir.
2000), defendant pled guilty to a single count of methamphetamine
distribution.  She faced a net Guidelines offense level of 33 and a
corresponding range of 108-135 months.  Defendant was incarcerated

from the time of her arrest and, by the date of her sentence, her "common-law" husband had died, leaving defendant's eight-year-old son without a custodial parent.  Judge Marshall, of our district, granted a four-level downward departure on the basis of extraordinary family circumstances.  Id., at 1124.  On review, the Ninth Circuit stated that the downward departure of four levels was not an abuse of discretion "based on the fact that there is an 8 year-old son who's lost a father and would be losing a mother for a substantial period of time."  Id., at 1127.  There was no evidence regarding where or how the child would be cared-for while his mother served her 57-month sentence.

The cases fall very neatly into a set of limitations that should be applied here.  Namely, the type of "extraordinary" family circumstances for which downward departures were granted were indeed extraordinary, where defendant's dependents required serious care for extreme illness, no less whose conditions were neither elected nor capable of simple treatment or short-term resolution; the evidence was uncontroverted, or uncontrovertable, and equally without spin or reliance on defendant's own statements or opinion; the amounts of the departures were relatively small, as was each defendant's pre-departure Guidelines exposure; and none of the defendants was involved in repeated, serial, organized fraud over several years where the defendants organized and lead a conspiracy of fraudsters into causing millions in loss while enjoying a lavish lifestyle.

Applying these limitations here, stripped of defendant's self-serving statements and what may be characterized as either conveniently engineered evidence or information that simply cannot be

corroborated, defendant's request for a variance cannot be sustained. The Court must take into account the severity of defendant's offense conduct, his *admitted* leadership role in the offense, and the enormous difference between the stipulated low-end sentencing range and what defendant urges, to name but a few problems that defendant cannot surmount.  Reduced to its essence, the record shows that defendant is in the same position as that of any other parent whose family may be affected by incarceration, but nonetheless one that does not warrant a downward departure.  See, e.g., United States v. Berlier, 948 F.2d 1093, 1096 (9th Cir. 1991) ("Berlier 'has shown nothing more than that which innumerable defendants could no doubt establish: namely, that the imposition of prison sentences normally disrupts spousal and parental relationships . . . .'" (citations omitted)); see also, United States v. Brand, 907 F.2d 31, 33 (4th Cir. 1990) ("A sole, custodial parent [facing incarceration] is not a rarity in today's society . . . and that children will have to live with relatives, friends, or even in foster homes.").

C.   Need for Deterrence, Just Punishment, Public Protection

Several facts show that the recommended 60-month sentence satisfies the need for deterrence, just punishment, and to protect the public from further harm.

First, "[a]ll sentencing proceedings are to begin by determining the applicable Guidelines range.  The range must be calculated correctly.  In this sense, the Guidelines are 'the 'starting point and the initial benchmark,'' Kimbrough [v. United States], 128 S.Ct. 558, 574 (2007) (quoting Gall v. United States, 128 S.Ct. 586, 596 (2007)), and are to be kept in mind throughout the process, Gall, 128

1    S.Ct. at 596-97 n. 6." United States v. Carty, 520 F.3d 984, 991
2    (9th Cir. 2008).  Furthermore, "*in the overwhelming majority of*
3    *cases, a Guidelines sentence will fall comfortably within the broad*
4    *range of sentences that would be reasonable in the particular*
5    *circumstances.*" United States v. Treadwell, 593 F.3d 990, 1015 (9th
6    Cir. 2010) (internal quotation marks and citation omitted; italics
7    added); accord Carty, 520 F.3 at 994; Rita v. United States, 551 U.S.
8    338, 351 (2007) ("[W]hen the judge's discretionary decision accords
9    with the Commission's view of the appropriate application of §
10   3553(a) in the mine run of cases, it is probable that the sentence is
11   reasonable.").

12        Moreover, the Ninth Circuit has also held that a district court
13   abuses its discretion in discounting the severity of white collar
14   crime.  For example, in United States v. Bragg, 582 F.3d 965, 970-971
15   (9th Cir. 2009), the Ninth Circuit reversed a probationary sentence
16   in light of a two-year, low-end Guidelines net offense range where
17   the district court justified by its view that a custodial sentence
18   would not likely deter future conduct.  The court noted that the
19   district court's view was not only unsupported by the scant facts but
20   contrary to the Sentencing Commission's own findings.  Id., at 969-
21   970.  Indeed, treating defendant as a victim of banks that allegedly
22   (but without proof) encouraged fraudulent loan applications, as
23   defendant urges, would "raise concerns of sentencing disparities
24   according to socio-economic class." United States v. Levinson, 543
25   F.3d 190, 201 (3d Cir. 2008).

26        Additionally, white-collar criminals *do* deserve Guidelines
27   sentences, including incarceration.  In a fairly recent survey, 65%

28
                                   11

of district court judges reported that the Guidelines set the appropriate range for fraud offenders; 24% believed the Guidelines were too low; only 10% believed they were too high.  See U.S. Sentencing Commission, "Results of Survey of United States District Court Judges January 2010 through March 2010" at 13, available at http://www.ussc.gov/Research_and_Statistics/Research_Projects/Surveys/20100608_Judge_Survey.pdf.  That is in stark contrast to the only 28% who agreed with the crack Guidelines (70% believing them too high), and the 26% who agreed with the possession of child pornography Guidelines (70% again believing them too high).  With respect to mortgage fraud offenders like defendant, the government suspects that support for high sentencing would be even stronger.

Next, as shown by the attached letter from Ventura County District Attorney Gregory Totten, defendant's brazen conduct harmed the overall real estate industry in this growing community.

Next, defendant's victims were more than just banks.  They included non-English speakers who worked hard to make ends meet but who were abused into believing that they could afford huge mortgage payments.  They closed escrow only to find they could not even make their first loan payments.  Foreclosures quickly ensued.  Defendant profited not only by the enormous commissions and loan fees for engineering those deals, but by taking over the properties (e.g. the Fuchsia deal) and renting them for a profit with no risk (because he was not the borrower).  The long-lasting harm to the credit of the borrowers who trusted defendant cannot be measured.  A stiff sentence of 60-months can.

Next, defendant "acknowledged that [defendant] had a supervisory

12

role" in the loan brokerage [that peddled bogus loans]."  Defendant's Memorandum, 7:2-3.  It is reasonable that the supervisor and leader (a Guideline factor to which defendant stipulated) be held responsible for that role.  Thus, it is not reasonable that defendant be given any leniency for attempting to minimize the enormous profits and power he received for his offense conduct by calling it a "minor Ventura County real estate empire that is at issue in this case."  Defendant's Memorandum, 7:3.  That may be his or his counsel's glib view, but is inconsistent with the facts.

Finally, defendant employed his own relatives to carry out his bidding.  He left them holding the bag when he left for Costa Rica.  All of them pleaded guilty early on and agreed to testify against defendant.

D.   There is No Unwarranted Sentencing Disparity

This factor is an aggravating factor, not a mitigating factor.  As a matter of law, "a sentencing disparity based on cooperation is not unreasonable."  United States v. Carter, 560 F.3d 1107, 1121 (9th Cir. 2009).  Here, defendant stands out not only as one who did not cooperate, but who occupied, by his own admission, a controlling ownership and supervisory position over those *who cooperated*.

Next, defendant has failed to advise about the sentences imposed for other mortgage fraud defendants in this district whose sentences inform the sentence that should be imposed here.  Notably, defendant Rosa Fernandez, a Ventura County mortgage broker who worked for a competing brokerage, who *did not* own her own brokerage and *did not* supervise anyone, received an 84-month sentence in 2014 for losses of approximately $3MM (as compared with losses here of more than $8MM).

1   No less, Fernandez was a single mother of two minor children.  <u>U.S.</u>
2   <u>v. Fernandez</u>, CR 10-599-JAK.  A 22-year old former part-time "7-11"
3   employee and "go-fer" for defendant Jose Garcia, whom defendant
4   encouraged to buy multiple houses, including one from defendant's own
5   mother, was sentenced to 46-months imprisonment.  This individual had
6   *no real estate experience* or training and did not supervise anyone.
7   <u>U.S. v. Banales</u>, CR 10-600-R.  Another individual, referred to in
8   defendant's papers as "R.R.," was sentenced to 30 months imprisonment
9   followed by three months home detention (as a condition of supervised
10  release); that individual had several minor children to care for and
11  caused losses of $864,400.  <u>U.S. v. Raul Rocha</u>, CR 10-599-JAK.  Two
12  Ventura County residents, husband (realtor) and wife (loan broker)
13  with minor children, each received 24-month prison sentences for
14  losses of less than $1,000,000.  Their prison terms were staggered to
15  permit care of the children.  <u>U.S. v. Rogelio and Patricia Vega</u>, CR
16  10-599-JAK.  Neither owned or operated a business and neither was a
17  supervisor.

18  IV.   CONCLUSION

19       The government respectfully urges the Court to impose a 60-month
20  term of imprisonment, followed by restitution as outlined by the

21  ///
22  ///
23  ///
24  ///
25  ///
26  ///
27  ///

28

1 │ Probation Officer, and such other terms and conditions similarly set

2 │ forth by the Probation Officer.

3 │ Dated: January 21, 2016          Respectfully submitted,

4 │                                  EILEEN M. DECKER
   │                                  United States Attorney
5 │
   │                                  LAWRENCE S. MIDDLETON
6 │                                  Assistant United States Attorney
   │                                  Chief, Criminal Division
7 │

8 │
   │                                  _____/s/_____
9 │                                  MARK AVEIS
   │                                  Assistant United States Attorney
10 │
   │                                  Attorneys for Plaintiff
11 │                                  UNITED STATES OF AMERICA



**OFFICE OF THE DISTRICT ATTORNEY**

COUNTY OF VENTURA, STATE OF CALIFORNIA

GREGORY D. TOTTEN
District Attorney

JANICE L. MAURIZI
Chief Assistant District Attorney

MICHAEL K. FRAWLEY
Chief Deputy District Attorney
Criminal Prosecutions

W. CHARLES HUGHES
Chief Deputy District Attorney
Administrative Services

MICHAEL D. SCHWARTZ
Special Assistant District Attorney
Justice Services

R. MILES WEISS
Chief Deputy District Attorney
Special Prosecutions

MICHAEL BARAY
Chief Investigator
Bureau of Investigation

January 15, 2016

Ms. Pamela Chen
U.S. Probation Officer
600 U.S. Courthouse
312 N. Spring Street
Los Angeles, CA 90012

Mr. Mark Aveis
Assistant United States Attorney
Major Frauds Section
United States Attorney's Office
1100 United States Courthouse
312 N. Spring Street
Los Angeles, CA 90012

Re:   *U.S. v. Jose Baustista Garcia*, CR 13-451-GW

Dear Ms. Chen and Mr. Aveis:

I write to respectfully request that you convey this letter to the Honorable George H. Wu
for his consideration in the sentencing of the above-named defendant currently set for
January 28, 2016.

Jose "Joe" Garcia's course of criminality severely and negatively impacted not only the
local economy but a vast number of indirect victims and their families who lost their
homes to foreclosure. Garcia perpetrated his crimes as the lead broker and owner of five
distinct real estate business entities located in Ventura County. Garcia's claim that he
merely failed to adequately supervise employees who committed various real estate
frauds rings hollow and demonstrates his failure to accept full responsibility for his
actions.

Ventura County is fortunate to have a vibrant and proactive real estate industry and ten
years ago, their members formed a Real Estate Fraud Advisory Team ("REFAT") to
address the growing prevalence of real estate fraud in our communities. Since its
inception, I have met with and addressed REFAT members on a number of occasions.

U.S. Probation Officer Pamela Chen
Assistant United States Attorney Mark Aveis
January 15, 2016
Page 2


The one name these true real estate professionals repeatedly inquired about was none
other than Joe Garcia. Going back to 2005, it was readily apparent that Garcia's
reputation for suspicious and illegal conduct was well engrained within the communities
in which he plied his trade. That same year, my office implemented a dedicated real
estate fraud prosecution unit and we were inundated with complaints from victims facing
foreclosures arising out of real estate transactions conducted through Garcia's businesses.
The number of complaints concerning Garcia's enterprises far eclipsed those pertaining
to any other suspect or real estate agency in Ventura County.

In Garcia's sentencing memorandum, his counsel seeks to apportion blame upon the
banks and lenders which financed the fraudulent loans and transactions closed by Garcia
through his various entities. While these larger financial institutions and their principals
may share responsibility for the damage inflicted upon our national economy, Garcia, a
resident in one of Ventura County's most affluent neighborhoods, was a knowing, willing
and prolific actor who perpetrated a number of long-running frauds against these lenders.
Thus, Garcia took full advantage of the already too-liberal financing terms and lax
underwriting to maximize his profits by directing subordinates to close transactions with
obviously unqualified buyers, by use of any means necessary.

Now is the time for Garcia to finally be held accountable for his long-running predatory
schemes. I urge this court to consider the overall gravity of these crimes and their impact
upon often economically disadvantaged and often mono-lingual people, who lost their
homes and creditworthiness. Thus, I ask you to sentence Garcia to the statutory
maximum sentence of five years in actual custody. By imposing this term of
imprisonment, your Honor will send an unequivocal message to the real estate industry,
as well as his many indirect victims, that Garcia and others who commit financial crimes
of this magnitude will be held accountable through the imposition of just punishment.

Very truly yours,

GREGORY D. TOTTEN
District Attorney

GDT:jd